Florence S. Thomson, as Executrix of Samuel. C. Thomson, Deceased, Respondent, *v.* New York Trust Company, Appellant.

First Department, June 11, 1943.

*Alfred A. Cook* of counsel (*J. Adam Murphy* and *Henry Cohen* with him on the brief; *White & Case,* attorneys), for appellant.

*Allen T. Klots* of counsel (*Lee J. Perrin, G. R. Gerhard* and *J. D. Kernan, Jr.,* with him on the brief; *Appleton, Rice & Perrin,* attorneys), for respondent.

DORE, J.  Samuel C. Thomson, plaintiff's testator (hereinafter referred to as "depositor") maintained from 1930 to 1940 checking and custodian accounts with defendant New York Trust Company (hereinafter "the bank").  During that period depositor gave his trusted employee and financial agent, Mrs. Mary B. Roberts (hereinafter "attorney in fact"), broad powers of attorney.  Acting on such powers lodged with the bank, the attorney in fact withdrew securities and converted them to her own use.  By the judgment appealed from, the bank on the theory of negligently failing to heed "notice" has been held liable for a considerable part of the thefts committed by the depositor's own employee.

The facts are really not in dispute.  Depositor had a checking account with defendant or its predecessor from 1915 and a safe-keeping account from 1926.  On February 5, 1930, he opened with the bank a custodian account of his securities which embraced a security account, an agency cash account containing the income from the securities and debits for expenses; also, a checking account in which balances from the agency cash account were transferred.

On May 16, 1930, depositor delivered to the bank a power of attorney naming his own employee M. B. Roberts as his attorney in fact and authorizing the bank to follow any and all of her instructions whether written or oral in respect to the sale or exchange of his securities expressly *including delivery* of such securities *to the attorney herself.*

On October 31, 1931, depositor delivered to the bank an additional power of attorney signed and acknowledged by him. This gave the same attorney in fact broader powers including authority to sign checks and promissory notes, to borrow money from the bank in depositor's name in such sums as she thought proper and pledge any and all of his securities for such loans; she also was given authority to make and deliver to the bank on depositor's behalf any such agreements or contracts " verbally or in writing   *   *   *   as my said attorney may deem proper; " no particular form of signature was required to be used by the attorney in fact.

In 1930 depositor retired from active work, but maintained an office in New York to which he went several times a year. He had an active interest in his own financial affairs and kept in close contact by letter and otherwise with his attorney in fact.  She prepared and sent regularly to him detailed statements called " white sheets " purporting to show him the exact state of his checking account, the source of each item of income and the detail of checks cleared.  She also sent him regularly other statements prepared by her called " blue sheets," purporting to list all the securities held by him at the date thereof.  She also kept for him a complete set of books. From the beginning of her embezzlements in 1930, these statements, reports and books were falsified to conceal her embezzlements.  Depositor relied on her statements as correct reports of his checking and custodian accounts with the bank.  He always examined them with care, on several occasions pointing out minute errors of which he immediately advised her.

The record establishes and plaintiff conceded that the bank sent, addressed to depositor at his office in New York, monthly statements together with checks and vouchers showing all the transactions in his checking account; also written confirmations of the transactions in the custodian account, and periodical lists of securities held from time to time by the bank in the custodian account.  These were all found in depositor's office after his death.  The record also establishes and plaintiff does not dispute that from 1930 until his death depositor never once looked at any of the bank's statements or reports.

At the outset of her course of stealing, the attorney in fact, as expressly authorized by the power of attorney procured delivery to herself of depositor's securities, and thereafter converted them.  From about April, 1932, to November, 1933, she also used her power of attorney to draw some sixteen checks to her own order on depositor's account which she

deposited in her personal account maintained with the bank. In November, 1933, a vice-president of the bank Mr. Hovey (who was dead at the time of the trial) told the attorney in fact that this practice was unusual and must stop. She then discontinued such transfers. She continued, however, from time to time thereafter, thefts of depositor's securities by causing delivery of securities to herself and then converting them.

On November 18, 1936, the attorney in fact simulated depositor's name on a $75,000 promissory note and loan agreement and presented such signed documents to the bank. The " white " sheet then falsely showed the checking account balance as $80,000. Actually it was approximately $9,000, and the attorney in fact arranged the loan to get additional funds for the depositor's checking account; but the bank knew nothing of her purposes. The note as signed was accepted by Hovey, initialed by him and by one of the defendant's clerks. Sufficient of the depositor's securities were set aside as collateral and the bank paid $75,000 into depositor's checking account which was subsequently drawn upon and used.

From 1936 to 1940 the attorney in fact continued embezzlement of securities, and, when the depositor died in June, 1940, ignorant of the thefts, she had stolen $700,000. This was revealed only when plaintiff, as executrix, demanded that the bank turn over a balance claimed as shown in depositor's records kept by his agent for him.

The attorney in fact made a complete confession and on her plea of guilty was sentenced to a term in Bedford Reformatory which she was serving at the time of the trial. She had made restitution to the depositor to the extent of $36,000. She testified for plaintiff at the trial.

The complaint charges breach of the bank's contract to return certain securities claimed not to have been withdrawn by depositor and demanded damages of $731,971.40. No claim was made that the bank or any of its officers or employees *actually* knew the attorney in fact was stealing or guiltily co-operated in the theft; nor is any claim made that the bank or its employees acted in bad faith. The charge is that the bank during the course of the transactions had knowledge of facts which would put a reasonably careful banker on notice that the attorney in fact was engaged in irregularities; i. e., in final analysis that the bank was negligent in not heeding notice and is therefore responsible for all loss subsequent to the date of claimed notice.

Defendant denied any breach of contract and relied on its defense that it had paid depositor all debts owing, and delivered to him all securities he was entitled to receive in obedience to his orders and in reliance on the powers of attorney he had given and directed the bank to follow. The bank also set forth sending the monthly statements, vouchers and confirmations, depositor's retention of them for ten years without complaint, and his negligence in failing to report to the bank any unauthorized withdrawals of money or securities after he knew or should have known of the unauthorized acts of his own agent. Defendant claimed that such negligence and the criminal acts of depositor's own agent caused the loss and that such loss was not caused by any negligence of the bank.

The trial court charged that if the jury found the bank was chargeable with notice that the attorney in fact was misappropriating depositor's securities, then with regard to any withdrawals thereafter the bank could not rely upon the powers of attorney; and left to the jury to determine whether the defendant had notice and, if so, as of what date. While the court charged that the burden of proof was on plaintiff to establish the claimed breach of contract, it also charged that the bank had the burden of proving not only that the depositor was negligent in failing to examine his bank statements but also that the bank itself was free from any negligence on its part; that if the bank had notice, or as a reasonably careful banker should have had notice of misappropriations, depositor's failure to examine his statements and canceled checks was no defense; in short, that if the depositor was negligent in not examining the statements and the bank also was negligent, the bank could not avail itself of the depositor's negligence as a defense.

The attorney in fact testified that from 1929 until he died depositor never asked for and never looked at any of the bank statements; that she did not send them to him and that no complaint of any kind was made throughout the decade in question to defendant bank. At trial the first date plaintiff claimed the bank had notice was April 26, 1932, when the attorney in fact wrote a letter asking the bank to transfer $2,000 from the depositor's account to her account in which at the time she had a small overdraft.

The jury found that the bank was chargeable with notice on November 18, 1936, the date the attorney in fact procured the $75,000 loan on the promissory note to which she had simulated depositor's signature. Following to the penny the

summary compilation of damages prepared by plaintiff's accountant, the jury found unanimously for plaintiff in the sum of $271,788.38. That sum with interest resulted in the judgment against defendant for $300,995.21, and defendant appeals.

Although plaintiff at trial earnestly contended that the bank had notice at much earlier dates and, accordingly, claimed larger balances due, the jury found against plaintiff on all such issues, and plaintiff has not appealed.

Plaintiff contends that from the nature of the transactions viewed cumulatively the jury was entitled to find that the bank had notice that the attorney in fact was acting outside the scope of the authority given by the bank's depositor and after such notice the powers of attorney constituted no defense; and that the verdict and the judgment are supported by the evidence and the applicable rules of law.

Defendant contends that there is no basis in the evidence for the jury to find notice of the attorney in fact's purposes at any date, including November 18, 1936; that it was erroneous as a matter of law to charge defendant with liability for embezzlements after November, 1936, because of claimed notice as of that date. Defendant points out that liability has not been imposed upon the bank in connection with the $75,000 loan but only for securities subsequently delivered pursuant to the powers of attorney and thereafter converted by the depositor's agent; that all such deliveries were made in good faith in obedience to the depositor's instructions to accept the orders ·of his attorney in fact; that between the making of the $75,000 loan and the subsequent embezzlements the criminal act of the attorney in fact and the gross negligence of the depositor intervened; and that defendant could be held liable only for guilty participation which concededly was not established.

In *Critten* v. *Chemical Nat. Bank* (171 N. Y. 219) plaintiffs, depositors, had an active account with the defendant bank therein, and sued for an alleged balance due from the bank. Davis, plaintiffs' employee, in twenty-four separate instances had abstracted checks made to pay approved bills, obliterated by acids the payee's name and the amount, made the check payable to cash, raised the amount (usually by $100), drew the money from the bank, paid the bill and appropriated the net balance. The checks were balanced every two months and returned by the bank but plaintiffs intrusted to Davis verification of the balances and thus the forgeries were not discovered until someone else in Davis's absence checked the balances and then Davis

went to jail. The defendant pleaded payment and charged negligence against the depositors both in the way the checks were drawn and the failure to discover the forgeries when the pass book was balanced and the vouchers returned to the depositors.

The court held that a depositor must exercise reasonable care to verify the vouchers and if he has by negligence in failing to detect forgeries and give notice to the bank caused loss to the bank by enabling the forger to repeat his fraud or by depriving the bank of an opportunity to obtain restitution, the depositor is responsible for the damage caused. But the court held the bank in that case grossly negligent in paying a sixth check in the series where the word " cash " had been inserted in place of the payee's name which had been erased, and the check was obviously mutilated. It also held the effect of that negligence did not cease with the payment of that check as the forgeries would have been exposed if the bank had reported the mutilated check to the depositor. The successful embezzlements thereafter were held to be fairly attributable to the " folly " of the bank in paying out depositor's funds on a plainly altered check and held it liable for the sixth and all the subsequent checks.

The facts on which liability was based in the *Critten* case are essentially different from the facts on which liability has here been predicated. In that case, the bank, in accepting the sixth check, *paid out* the depositor's money on a forged check to one not entitled to the proceeds. The mutilation of the check was so gross as to put any bank on notice that the one to whom the bank was paying out the depositor's money was not the one to whom the depositors had ordered it paid. In this case the attorney in fact who negotiated the loan on the $75,000 promissory note had express authority lodged with the bank authorizing her to borrow from the bank in depositor's name in such sums as *she* thought proper and to sign any and all promissory notes in the depositor's name and pledge any and all of his securities for such loans. No particular form of signature was prescribed; she could sign his name or her own. The bank was not *paying out* depositor's money either to the attorney in fact or to third persons but *paying into* depositor's account the bank's money, as the proceeds of the loan. The attorney in fact was exercising the power she was expressly authorized to exercise and had exercised on previous occasions without any complaint from depositor. On this record we think defendant was under no obligation to anticipate the faithlessness of the attorney in fact or to question the signature as it would be in connection with a check to pay out the depositor's funds.

In *Oquendo* v. *Federal Reserve Bank of New York* (98 F. 2d 708, 710, cert. den. 305 U. S. 656) the plaintiff sued to recover the proceeds of a check which had been misappropriated by her attorney to whom a general power of attorney had been given. The attorney in fact received a check payable to his principal which he indorsed by simulating her signature and used the proceeds. The complaint was dismissed at the end of the plaintiff's case. In affirming the trial court, the Circuit Court of Appeals said with respect to the alleged forged indorsement: "The appellant makes much of the fact that Mrs. Oquendo's signature was simulated, but we think such fact immaterial. (*Kiekhoefer* v. *United States Nat. Bank of Los Angeles,* 2 Cal. 2d 98, 39 P. 2d 807, 96 A. L. R. 1244.) Her attorney had power to endorse her name, either by his own hand or by adopting the hand of another. Am. L. Inst. Agency § 78. It was not necessary for him to sign ' per pro.'; section 38 of the New York Negotiable Instruments Act provides that ' The signature of any party may be made by a duly authorized agent.' See *Youngs* v. *Perry,* 42 App. Div. 247, 59 N. Y. S. 19." The case before us is even stronger, as here no funds of the principal were being diverted on the strength of the signature, but the bank's funds were being paid into the principal's own account.

The relations between the depositor and his agent and this bank had not begun with the loan in 1936 or with the opening of the custodian account in 1930. Mrs. Roberts had been depositor's secretary since 1922, had paid his bills, made out his tax returns and before she received the powers of attorney she had exercised with his complete approval considerable authority over his accounts. Thus, in 1928 she had ordered the bank to deliver to " bearer " $10,000 of depositor's Federal Water Service 5-1/2% 1957 bonds, charging his account; she had directed the bank to place depositor's funds on call money loans up to $200,000 at a time; she had signed demand promissory notes in his name for sums as large as $25,000 and delivered them to the bank for loans. Other transactions were initiated and carried out at her direction and upon her signature up to May, 1930. These transactions conducted for depositor by his agent, were carried out by the bank, reported to depositor, and approved and ratified by him. Of such transactions prior to 1930 no complaint or claim was made in the pleadings or at the trial. By the powers of attorney, depositor had given his attorney in fact complete control over his cash and securities. Prior to 1936 there had been years of acquiescence in the numerous transactions conducted by the attorney in fact.

Obviously defendant was not called upon to question her motives in making the loan complained of in November, 1936.

In *Grave* v. *Corn Exchange Bank Trust Co.* (287 N. Y. 94) one of the questions presented was when, if at all, the bank acquired notice so as to render it liable for the diversion of trust funds. In that case the trustee maintained two accounts with the defendant, a trust account and a personal account; he was personally indebted to the bank and a corporation in which he had an interest was also so indebted. By means of transfers from the trust account to his personal account, the trustee misappropriated the trust funds. During the time that these transfers were made, a number of overdrafts created in the personal account were made good out of trust moneys. In addition, the bank deducted interest on the trustee's indebtedness to it out of his personal account.

With respect to the overdrafts and interest deductions, the court held that they were insignificant in amounts and the bank was justified in treating them as routine matters, and said (at p. 102): "In considering the effect of this evidence we must constantly bear in mind that the bank was under no duty to exercise vigilance to protect the trust estate from possible embezzlement by the trustee. When it accepted the trust account in which the trust funds were deposited, it assumed the obligation to pay out the moneys deposited in accordance with the directions of the trustee. It assumed no other obligation. To establish joint liability of the bank for the derelictions of the trustee, the plaintiffs must prove that the bank gave to the wrongdoer such assistance as would make the bank a participant in the wrong. Proof that the bank failed in care is insufficient. * * * There can be no doubt that when the bank, pursuant to the directions of the trustee, debited the trust account and credited the trustee's personal account with the amount of the checks, which the trustee drew to his own order upon the trust account *and then deposited in his personal account,* and when the bank thereafter honored the personal checks of the trustee by means of which the theft was consummated, it, in fact, was assisting the trustee in stealing the trust moneys. Even so, unless in addition it appears that the bank knew that the trustee was engaged in embezzling trust funds by withdrawal of the trust money in the personal account *in order to apply them to his own use,* the bank was justified in following the directions of the trustee." In that case, however, when the personal account of the trustee consisted entirely of trust funds he repaid a personal indebted-

ness to the bank out of such funds in his personal account; this was held to be adequate notice and the bank from that time forth was held liable for diversions.

Plaintiff points out that the *Grace* case and other cases (such as *Bischoff* v. *Yorkville Bank,* 218 N. Y. 106; *Clarke* v. *Public National Bank & Trust Co.,* 259 N. Y. 285) were cases in which the deposits were by a trustee or fiduciary in his name as such and the bank's breach of duty was to third persons, beneficiaries of the trust; that in such cases knowledge approaching consciousness of guilt might well be required; but that here the issue is the bank's performance of its own contract with its depositor. Ordinarily that distinction is valid. But here the depositor by the powers of attorney had given his own agent, who was clearly a fiduciary, the widest authority and control over the accounts and securities in his name and directed the bank to follow her orders. Under the scope of the powers of attorney here given and the undisputed facts disclosed, no liability attached in making the loan in November, 1936. In *Levy Fabrics, Inc.,* v. *Shapiro Bros. Factors Corp.* (259 App. Div. 463, 465) this court said: "An essential element to enable a principal to recover damages for conversion by a general agent is that there must be knowledge or notice of a transfer by the agent whereby his principal is deprived of its property. (*Wen Kroy Realty Co., Inc.,* v. *Public National Bank & T. Co.,* 260 N. Y. 84, 90.)"

With regard to the transfers by checks from the depositor's account to the attorney in fact's personal account between April, 1932, and November, 1933, the attorney in fact had authority to make such transfers and the bank was protected by the presumption that she was applying the funds in accordance with her instructions. That in a very few instances such transfers were made when small overdrafts existed in her personal account did not under the ruling in the *Grace* case destroy the presumption, especially where as here it appeared that depositor's bills were in part being paid out of the attorney in fact's personal account. In any event as to all such transactions the jury found against plaintiff and plaintiff does not appeal.

In *Potts & Co.* v. *Lafayette National Bank* (269 N. Y. 181) one Eckart, depositor's employee, and one Wyatt, the bank's cashier, co-operated in diverting the proceeds of depositor's checks. The court held that the failure of the depositor to object to the accounts was not excused because by direction of the conspiring officer of the defendant bank in that case the

depositor's monthly statement was held until called for by its dishonest employee; that through delivery to such employee the statements came into the depositor's possession and it was under a duty to examine them. The court said at pp. 187, 189: "* * * The plaintiff owed to the defendant [bank] a positive duty to examine the monthly statements of its accounts. It intrusted performance of that duty to its dishonest employee, Eckart, who alone knew that he was diverting the proceeds of the plaintiff's checks received by the bank. * * * What was said in *Critten* v. *Chemical Nat. Bank* (171 N. Y. 219, 230), in regard to a similar situation, applies here, with change only of the name of the dishonest employee: ' The plaintiffs' position may be no worse because they intrusted the examination to [Eckart] instead of to a third person; but they can be no better off on that account. If they would have been chargeable with the negligence or failure of another clerk in the verification of the accounts, they must be equally so for the default of [Eckart], so far as the examination itself would have disclosed the facts.' * * * Here, acquiescence was due solely to the negligence or wrong of the plaintiff's own agent, and for such negligence or wrong the plaintiff was responsible." The rule in the *Potts* case, quoted from the *Critten* case, is *a fortiori* applicable here where there is no proof and no claim of guilty co-operation or even bad faith on the part of the bank or any of its officers or employees.

The *Potts* case is one of many decisions holding that recovery may be denied to a depositor for failure to examine his bank statements and returned checks. (*National Surety Co.* v. *Manhattan Co.*, 252 N. Y. 247; *Fredericks* v. *National City Bank of New York*, 155 Misc. 800, affd. on opinion below, 245 App. Div. 704; *Empire Trust Co.* v. *Cahan*, 274 U. S. 473, 479; cf. *Prudential Ins. Co.* v. *Nat. Bank of Commerce*, 227 N. Y. 510.) In the *Cahan* case (*supra*) a son, who had a broad power of attorney to draw checks upon his father's bank account, drew checks and deposited them to his own credit in the bank. It was held that did not charge the bank with notice of misappropriation so as to make it liable to the father for losses, especially where two years elapsed before the father discovered the misappropriation. The court (per HOLMES, J.) said: "* * * The person reposing confidence in the son was not the petitioner [bank] but the respondent [depositor] * * *. He put his deposits absolutely into his son's power; and the son, if he drew currency, as he might, could do with it as he saw fit. * * * For in addition to what we have said, the transactions went on for over

two years and the petitioner [bank] fairly might expect the respondent [depositor] to find it out in a month or two if anything was wrong. Careful people generally look over their bank accounts rather frequently."

Where a bank pays out depositor's money on a check to which the depositor's signature is forged, the bank may be initially liable and has only an offset for damages caused by the depositor's negligence which offset may be lost if the bank itself was also negligent. In such case the bank has the burden to prove the depositor's negligence and its own freedom from contributory negligence. (*National Surety Co.* v. *Manhattan Co.*, 252 N. Y. 247, 258; *Paton Co., Inc.*, v. *Guaranty Trust Co.*, 227 App. Div. 545, 549.) As indicated, that state of facts is not presented here as the basis for defendant's liability.

It may not properly be said there is here a distinction between the checking account and the custodian account. At trial plaintiff conceded that all checks drawn on depositor's account were charged and appeared on the monthly statements sent by the bank to depositor. Plaintiff also conceded that the confirmations and statements showing the transactions in the custodian account were regularly sent by the bank to depositor and received at his office at or about the time of each transaction. Indeed defendant proved without contradiction that specific advices relating to all the precise transactions that were the subject of plaintiff's claims were sent to depositor at his office and received there.

The bank had over a thousand employees, forty officers, and cleared between 20,000 and 90,000 checks a day. The trial court charged without objection from plaintiff that the bank could not be charged with guilty participation in the embezzlements upon the fiction of a constructive composite knowledge of every fact of which any employee had notice.

The depositor here was an intelligent man, keenly interested in his own financial affairs. He followed the prices of the stock market, giving orders to his attorney in fact for the purchase and sale of securities. He kept his own check book, made out all his own checks and carefully numbered and accounted for them. But during the whole ten years in question he never once asked for or looked at any of the numerous statements and reports sent him by the bank when an examination of any one of them would have immediately disclosed the embezzlements as the proof indisputably showed and as depositor's son, witness for plaintiff, admitted at the trial.

We confine our ruling to this record as it comes before us. By its verdict the jury held the bank was not liable on any claimed notice prior to November, 1936. As indicated defendant may not be held liable on the basis of the November, 1936, transaction. In addition to what has been said no loss is here shown as the direct result of the $75,000 loan. The proceeds of that loan went into the depositor's account and were paid out to his order. The losses were incurred through subsequent criminal acts of the depositor's own agent in embezzling the securities and through his own gross contributory negligence extending over a period of ten years.

The judgment appealed from should be reversed, with costs, and the complaint dismissed, with costs.

CALLAHAN, J. (dissenting in part). Plaintiff's action rested upon the theory that the defendant had knowledge of facts which would have put a reasonably careful banker on notice that the attorney in fact was guilty of irregularities. The trial court instructed the jury that defendant bank was chargeable with notice if, "with the use of ordinary care" it should have detected such irregularities. A claim of that nature placed defendant's liability on negligent omission to perform a duty. Therefore, the case was not one where plaintiff's right to recovery rested on the existence of bad faith or of actual knowledge by the bank that there had been a diversion of plaintiff's property. Though the complaint pleaded breach of contract for the failure to return securities on demand, the gravamen of plaintiff's cause of action was the negligent failure to perform such contract. Under such circumstances the negligence of plaintiff's testator in failing to examine statements would be a bar to recovery, and plaintiff may not avoid such a defense by mere repetition of the claim of defendant's negligence.

If the case were one like *Critten* v. *Chemical Nat. Bank* (171 N. Y. 219) wherein a bank had paid a forged instrument and was seeking to assert a set-off against its absolute liability on the basis of plaintiff's failure to examine vouchers, a different rule would apply. Notice on the part of the bank (proof of negligence) would not be essential to establish plaintiff's right to recover in such a case. The bank would be absolutely liable, having what amounted to a right of set-off based on the depositor's negligence, which right would, in turn, be barred by the bank's contributory negligence.

The court's charge which said, in effect, that if the bank had notice of irregularities, depositor's failure to examine his

statements constituted no defense, was error which requires reversal of the judgment. It is my view, however, that a new trial should be ordered. We cannot say that the failure to examine the statements was negligence as a matter of law, where, as here, a trusted but dishonest employee used skillful methods to allay testator's suspicion, by furnishing her employer with false reports of the condition of his accounts. Under such circumstances a jury might say that plaintiff's testator acted with reasonable care in relying on these reports. Nor can we determine the question of " notice " as a matter of law. Notice may be proved by direct evidence or may be inferred or implied from circumstances. (*Fidelity & Deposit Co.* v. *Queens County Trust Co.*, 226 N. Y. 225.)

As a new trial is necessary, all of the issues raised by plaintiff's complaint must be tried over, for here there were not two claims easily separable, but a single claim the determination of which depended on the existence of notice, which, in turn, rested on cumulative events.

I vote to reverse the judgment and order a new trial.

MARTIN, P. J., UNTERMYER and COHN, JJ., concur with DORE, J.; CALLAHAN, J., dissents in part, in opinion.

Judgment reversed, with costs, and the complaint dismissed, with costs.